| T PLOTKIN, Judge.
Defendant, Dixon Mortgage Group, appeals a trial court judgment splitting mortgage brokerage fees 35 percent to Dixon and 65 percent to plaintiff, United Enterprises Corp., in this concursus proceeding. We amend the judgment to award the parties the total brokerage fees of $9,210 in the same percentages assigned by the trial judge. In all other respects, we affirm the trial court judgment.
FACTS
The mortgage brokerage fees that form the subject of this action were derived from mortgage loans made by Gelt Financial Corp. and dispersed to Mr. and Mrs. Carl Beloney on October 8, 1998. The security for the loans was two pieces of residential, rental property located at 448-450 Whitney St. and 841-843 Elmira St. in New Orleans, Louisiana. Elite Title Insurance of Metairie, which acted as closing and settlement agent for the loans, proposed to disburse the mortgage brokerage fees to Dixon. However, when United objected, Elite filed the |?instant concursus proceeding and deposited the mortgage brokerage fees of $9,210 into the registry of First City Court for the City of New Orleans.
At trial, United and Dixon each sought to establish its entitlement to the brokerage fees through elaborate paper trails, all of which began and ended with Ronald Lewis. According to the record evidence, Mr. Lewis was an employee at United’s Westbank office when Mr. and Mrs. Belo-ney first made application for the loans on June 22, 1997. At that time, Mr. and Mrs. Beloney signed at least two “Borrower-Broker” agreements with United, granting United an exclusive agency for 30 days from that date; those agreements provided for brokerage fees equal to ten percent of the gross amount of the loan secured. The record evidence indicates that Mr. Lewis and other employees at United’s Westbank office took some steps to secure the loans for the Beloneys. However, before the loans were finalized, Mr. Lewis was fired by United’s President, Clarence Wheeler, and United’s Westbank office was closed.
Thereafter, Mr. Lewis contacted Gwendolyn Dixon, president of Dixon, and was allowed to work out of Dixon’s office for some unspecified period of time. When he arrived at the Dixon office, he brought with him several files; the Beloney files were among those files. Mr. Lewis allegedly told Ms. Dixon that they were his own files. Apparently in reliance on Mr. Lewis’ representations, Dixon then entered two “Borrower/Broker” agreements with the Beloneys on September 25, 1998. The first of those agreements, which related to 841-843 Elmira, provided for mortgage brokerage fees of nine percent, while the second, ^related to 448^50 Whitney, pro *45 vided for a mortgage brokerage fees of 5.5 percent. Both agreements granted Dixon a 90-day exclusive agency to secure a mortgage on the subject property.
Ms. Dixon testified at trial that she was concerned about the files. Because she was concerned about the files, she said, she called Mr. Wheeler and was informed that United wanted nothing to do with any files that Mr. Lewis had worked on. It is impossible to determine from the record whether this alleged phone call occurred before or after Dixon entered the two “Borrower-Broker” agreements with the Beloneys on September 25, 1998. Moreover, Mr. Wheeler denies telling Ms. Dixon that United wanted nothing to do with any files that Mr. Lewis had worked on. He claims that he consistently told both Mr. Lewis and Ms. Dixon that the files belonged to United.
At trial, United presented copies of correspondence between the two companies to support its assertion that Mr. Wheeler consistently told Ms. Dixon that he considered the Beloney files the property of United. Much of that correspondence occurred on October 7, 1998 — some two weeks after Dixon had entered the agree-' ments with the Beloneys and the day before the two loans were dispersed to the Beloneys. The record contains a copy of a facsimile transmission sent by Germaine A. Davis of Dixon to Mr. Wheeler on that day. The note on the cover sheet of the facsimile says simply: “Please sign and return.” Attached are two separate letters dated October 7, 1998, both with a signature line for Mr. Wheeler. The letterhead includes United’s name and address, but is otherwise |4vastly different from the letterhead on United’s other correspondence contained in the record. One of the letters states as follows:
We do hereby release the appraisals on 448-450 Whitney Ave. and 841-843 Elmira Ave. to The Dixon Mortgage Group, Inc. located at 3201 Gen. DeG-aullé Dr., Suite 208 New Orleans, LA 70114.”
The other states as follows:
We do hereby release the file of Carl and Gail Beloney to The Dixon Mortgage Group, Inc. located at 3201 Gen. DeGaulle Dr., Suite 208 New Orleans, LA 70114.
Mr. Wheeler did not sign either letter.
Instead, Mr. Wheeler sent a letter to Ms. Dixon on the same date, October 7, 1998. That letter stated, in pertinent part, as follows:
This letter is in response to our telephone conversation regarding the releasing of loans for processing and subsequent closure by your company.
First and foremost, I would like to reiterate that these loans are the property of United Enterprises and were obtained by your company via Mr. Ronald Lewis, who was fired by me, and subsequently took these loans without permission. These loans, however many there may be, should and could have been completed in my East Bank office with no problem.
On October 13, 1998, Ms. Dixon sent another facsimile to Mr. Wheeler, asking that he sign and return the letter faxed on October 7, 1998, concerning the release of the appraisals.
The record also reveals that the two companies sought to negotiate an arrangement whereby they would divide the brokerage fees on the Beloney loans. In the October 7 letter quoted above, Mr. Wheeler offered to release the Beloney files, provided Dixon agreed to compensate United with 50 percent of the brokerage fees. Ms. Dixon answered that letter the same day, offering to pay United 40 percent of the brokerage fees. The record also contains a document | .¡marked “Agreement,” dated October 14, 1998, which confirmed United’s agreement to pay 30 percent loan officer fees to Helen Lombard.[1] *46 That agreement was signed by Mr. Wheeler and Mr. Lewis.
At any rate, because the Beloneys had been waiting some time to get their loans, Ms. Dixon said, she allowed Mr. Lewis to “work” those loans under the auspices of her office. The mortgage loan proceeds were dispersed to Mr. and Mrs. Beloney on October 8, 1998. Documents included in the record, labeled “U.S. Department of Housing and Urban Development” (hereinafter “HUD documents”), indicate that the mortgage brokerage fees were to be paid to Dixon. The brokerage fees relative to the mortgage of 841-843 Elmira totaled $4,410, or nine percent of the total loan of $49,000, as specified in the Beloneys’ agreements with Dixon. The brokerage fees relative to the mortgage of 448-450 Whitney Street totaled $3,520, or 5.5 percent of the total loan of $64,000, as specified in the Beloneys’ agreements with Dixon. Thus, the total brokerage fees under the agreements the Beloneys signed with Dixon was $9,210.
Despite the fact that both parties to the concursus proceeding claimed entitlement to the entire brokerage fees, the trial court elected to spit the fees between the parties on a quantum meruit basis. She found that the contest between the two parties was born of fraud on the part of Mr. Lewis, who was no longer associated with either party and was not present at trial. In written reasons for judgment, the court concluded as follows:
Concerning the fraud committed by Ron Lewis, Mr. Baloney testified that he contracted with Dixon Mortgage Group, Inc. only after being informed by Ron Lewis, fraudulently, that the United | (¿Enterprises Corporation had ceased operating. Gloria Dixon testified that she learned of Ron Lewis’ misrepresentations after a conversation with Mr. Wheeler, an officer of the United Enterprises Corporation. This occurred prior to the Baloneys’ Act of Sale. Accordingly, the Baloneys’ consent to contracting with Dixon Mortgage Group, Inc. may have been vitiated by Ron Lewis’ fraud. United Enterprises Corporation did the majority of the work and very little work. was done by Dixon Mortgage Group, Inc. The Court considered a 65%/35% spilt to be equitable and fair based on the events surrounding this litigation and the law of quantum merit [s.i.c.].
The trial judge entered judgment in favor of United in the amount of $4,925.70 and in favor of Dixon in the amount of $2,652.30.
Dixon appeals, assigning two errors: (1) that the trial judgment improperly awarded only $7,578, rather than the total amount deposited in the registry of the court of $9,210; and (2) that the trial judge misapplied the quantum meruit doctrine.
AMOUNT OF JUDGMENT
Both Dixon and United claim that the trial judge improperly reduced the total fees from the $9,210 listed in the HUD documents to a total of $7,578. The trial court’s reasons for judgment do not address this issue, and we see no reason for reducing the total amount of the brokerage fees, a fact not in dispute. Thus, the trial court judgment is amended to award total brokerage fees of $9,210.
ENTITLEMENT TO BROKERAGE FEES
Quantum meruit doctrine
The trial court cited the quantum meruit doctrine as authority for its decision to split the brokerage fees between Dixon and United. In support of its argument that the trial court misapplied that doctrine, Dixon cites the Louisiana Supreme |7Court’s opinion in Baker v. Maclay Properties Co., 94-1529 (La.1/17/95), 648 So.2d 888, which involved a trial court judgment granting a motion for summary *47 judgment and dismissing an in-state broker’s claim for a portion of a brokerage fee. The in-state broker’s claim was based on a fee-splitting arrangement with an out-of-state real estate broker. The court found that the fee-splitting agreement was an absolutely nullity because it was based on a statute that was unconstitutional under the privileges and immunities clause of the United States Constitution. Id. The court then determined that the in-state broker could not recover under the doctrine of quantum meruit because that doctrine “refers to the measure of compensation or price unstated in a contract.” Id. at 16-17, 648 So.2d at 896. Because the in-state broker had no contract, the court said, he had no claim under the quantum meruit doctrine. Id. at 17, 648 So.2d at 896. Thus, we agree with Dixon’s claim that the trial court misapplied the quantum meruit doctrine. Like the in-state broker in Baker, United could not be awarded the brokerage commission under the doctrine of quantum meruit.
However, under Baker, the inquiry does not end there. Although the court found that the in-state broker was not entitled to recover under the quantum meruit doctrine, it nevertheless remanded the case for further proceedings. The court held that the in-state broker might have a claim under one or both of two separate theories: (1) the unjust enrichment theory, or (2) the “procuring cause” theory.
Unjust enrichment doctrine
In finding that the in-state broker had stated a claim for unjust enrichment, the Baker court cited the following five elements for establishing such a claim:
|R(1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of “justification” or “cause” for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff.
Id. at 17, 648 So.2d at 896. (citation omitted). Dixon claims that United’s claim in the instant case does not fulfill all of the above elements.[2] We agree.
In the instant case, the trial court specifically found that “United Enterprises Corporation did the majority of the work and very little work was done by Dixon Mortgage Group, Inc.” That factual finding is sufficient to fulfill the first three elements of a cause of action in unjust enrichment. If, as the trial court found, United did most of the work, but Dixon reaped all of the benefits, Dixon was unquestionably enriched, United was unquestionably impoverished, and there was unquestionably a connection between the enrichment and the impoverishment.
However, the fourth element of a cause of action in unjust enrichment — i.e., an absence of justification or cause for the enrichment and the impoverishment — is not fulfilled under the facts of this case. Quoting Edmonston v. A-Second Mortgage Co. of Slidell, Inc., 289 So.2d 116, 122 (La.1974), the Baker case defines “cause” as follows:
“[clause” is not in this instance assigned the meaning commonly associated with ■contracts, but, rather, it means that the enrichment is justified if it is the result of, or finds its explanation in, the terms of a valid juridical act between the impo-verishee and the enrichee or between a third party and the enrichee. A valid juridical act with the enrichee is essential to a finding of “cause.”
94-1529 at 19, 648 So.2d at 897. Under that definition, the existence of valid legal agreements between Dixon and the Belo-neys is sufficient to constitute cause. | flThus, United is not entitled to recover *48 any portion of the brokerage fees from Dixon under the doctrine of unjust enrichment.
Procuring cause doctrine
The final question to be answered has not been addressed by Dixon— that is, whether United is entitled to recover under the “procuring cause” doctrine recognized by the court in Baker. That doctrine was explained as follows by the court in Jackson v. Free, 442 So.2d 1346 (La.App. 3 Cir.1983), a case involving a real estate broker:
Generally, a real estate broker is entitled to a commission if he is the “procuring cause” of a sale, even though the term of his listing agreement may have expired.
“Procuring cause” refers to the efforts of a broker in introducing, producing, finding, or interesting a purchaser, and means that negotiations which eventually lead to a sale must be the result of some active effort of the broker.
The term “procuring cause” is defined in the following language from 12 C.J.S. Brokers, § 91, pg. 208 ...
“As used in that branch of the law relating to brokers’ commissions, the terms ‘procuring cause’, ‘efficient cause’, and ‘proximate cause’ have substantially, if not quite, the same meaning and are often used interchangeably; they refer to a cause originating or setting in motion a series of events which without break in their continuity result in the accomplishment of the prime object of the employment of the broker, which may variously be a sale or exchange of a principal’s property, an ultimate agreement between the principal and a prospective contracting party, or the procurement of a purchaser who is ready, willing, and able to buy on the principal’s terms.”
As the above language suggests, in order to establish that his efforts were the procuring cause of a sale, the broker must show more than the mere fact that his actions in some way aided the sale.
Id. at 1348-49 (citations omitted).
ImDixon claims that the procuring cause doctrine should not apply to this case for two reasons: (1) because the agreements between United and the Belo-neys had expired on its face by the time the loans closed, and (2) because the amount of the mortgage brokerage fees was different in United’s agreements with the Beloneys, as compared to Dixon’s agreements with the Beloneys. Concerning Dixon’s first claim, the above quote from the Jackson case shows that the “procuring cause” doctrine applies even after the brokerage agreements expire — in fact, that is precisely the point of the doctrine. Brokers who have active agreements with borrowers have no need to invoke the procuring cause doctrine. Concerning Dixon’s second claim, nothing in the law prohibits the trial court or this court from dividing the fees earned under the Beloneys’ agreements with Dixon between the two brokerage firms. The Belo-neys’ agreements with United specified brokerage fees in excess of the amount specified in the United agreements; however, United has not sought any additional funds. Thus, the procuring cause applies to this case.
Under the procuring cause doctrine, a broker is entitled to recover for his efforts including “introducing, producing, finding, or interesting a purchaser,” whenever those efforts “eventually lead to a sale” which is the result of “some active effort of the broker.” Jackson, 442 So.2d at 1348. In the instant case, United presented evidence that it had ordered the appraisals of the Beloneys’ property, that it had received an invoice for the performance of those appraisals, and it had shipped the Beloney loan materials to Gelt Financial Corporation, which provided the mortgage loans, on September 3, 1998, just one month prior to the date the loans were disbursed. From this evidence, the trial court concluded that United had done “the *49 majority of the work” necessary to secure the mortgage loans for the Beloneys. That evidence is sufficient to prove that United was entitled to |ureceive at least a portion of the brokerage fees because it was the procuring cause for the mortgage loans. Moreover, we find no manifest error in the trial court’s decision to award 65 percent of the mortgage brokerage fees to United and 35 percent of the brokerage fees to Dixon. Thus, United is entitled to receive $5986.50, representing 65 percent of the brokerage fees, while Dixon is entitled to receive $3,223.50, representing 35 percent of the brokerage fees.
CONCLUSION
Accordingly, the trial court judgment is amended to award the total $9,210 brokerage fees to United and Dixon. The trial court’s judgment awarding 65 percent of the brokerage fees to United and 35 percent of the brokerage fees to Dixon is affirmed. In all other respects, the trial court judgment is affirmed.
AMENDED; AFFIRMED AS AMENDED.

. Ms. Lombard signed United’s original agreements with the Beloneys, both as loan *46 broker and as loan officer. However, the record contains no other evidence of Ms. Lombard's involvement with the loans or with the Beloney files.

. In its brief to this court, Dixon makes the exact mistake that concerned the Baker court — i.e., confused quantum meruit and unjust enrichment, by citing the elements for unjust enrichment as the elements for quantum meruit. The trial court may have been operating under the same confusion.